# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# LAFAYETTE DIVISION

| | |
|---|---|
| **IRVIN M. ESCORT** | **CIVIL ACTION NO. 6:17-CV-00484** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **OFFICER DERRICK MILES, ET AL** | **MAG. JUDGE PATRICK J HANNA** |

## RULING

Plaintiff Irvin M. Escort ("Escort") brought this lawsuit against Officer Derrick Miles ("Officer Miles"), Interim Chief Reginald Thomas ("Chief Thomas"), and the Lafayette City Parish Consolidated Government ("LCPCG"), seeking damages for injuries he allegedly sustained during his arrest following a traffic stop. Pending before the Court is a Motion for Summary Judgment [Doc. No. 24] filed by Defendants. Plaintiff Escort has filed an Opposition [Doc. No. 26], and Defendants have filed a Reply [Doc. No. 27]. For the following reasons, the Motion for Summary Judgment is **GRANTED**.

**I.    FACTS**

On April 23, 2016, Officer Miles observed Escort make an illegal U-turn on Hollywood Drive in Lafayette, Louisiana. Officer Miles stopped Escort and began investigating the alleged traffic violation by asking Escort for his identification. Escort acknowledged that he did not have his driver's license. Officer Miles noted a strong chemical smell emitting from Escort's person, similar to what he has smelled in past instances when a person has ingested PCP. At this point, Escort ran from Officer Miles.

While Escort was running away, Officer Miles saw Escort throw something to the ground, which was later determined to be a Scope bottle containing PCP. Officer Miles pursued Escort, overtook him from behind, and they both went to the ground.

Escort contends that Officer Miles broke his right elbow while attempting to handcuff him. He claims that he advised Officer Miles, immediately after he was cuffed, that his arm was broken, but Officer Miles said he should not have run and threatened him not to tell anyone.

Escort was taken by the booking officer to the medical station, where he was examined by a medical professional and x-rays were taken. Although the medical personnel at the jail advised him that there was no break or fracture, Escort went to Lafayette General Medical Center after he bonded out the following morning. There he was diagnosed with a nondisplaced fracture of the radial head.

Escort was initially charged with possession of PCP and resisting arrest. However, Escort and the District Attorney made an agreement that if Escort took and passed six drug screens and stayed clean, the charges would be dismissed. The District Attorney ultimately dismissed the charges.

Escort subsequently filed suit against Officer Miles, Chief Thomas, and the LCPCG, seeking damages for violations of his civil rights under 42 USC § 1983, et seq., as well as under state law.

Defendants filed the instant motion for summary judgment. The motion is fully briefed, and the Court is prepared to rule.

## II. LAW AND ANALYSIS

### A. Standard of Review

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment,

identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. However, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Anderson*, 477 U.S. at 248.)

    B.    **Analysis**

        1.    **Plaintiff's False Arrest/Unreasonable Seizure Claim**

Escort has conceded in brief that he cannot make a good faith argument that the seizure and the arrest were unreasonable, and that, as such, these claims should be dismissed with prejudice. This Court agrees with that conclusion, and therefore, the Court will dismiss these claims with prejudice.

### 2. Plaintiff's Excessive Force Claim

#### a. The *Heck* Doctrine

Escort acknowledges that an officer making a lawful arrest may use a reasonable amount of force to overcome resistance by a person being arrested. Escort contends, however, that he never actively resisted the arrest. He admits to taking 7-8 steps in furtherance of a flight, but he claims he stopped the flight prior to the seizure by Officer Miles. He argues that the slamming to the ground and the yanking and twisting of the arm to the point of breakage is excessive. Escort states that some form of force is a reoccurring theme when dealing with police officers, and that the force grows exponentially when there is flight or resistance. He asserts it is a sad fact that many individuals in high crime areas have grown to anticipate some force when they engage with police officers.

Defendants respond that Escort's excessive force claim is precluded by the *Heck* doctrine, as Escort admittedly participated in a pretrial diversion program which ultimately led to the dismissal of the charges brought against him. Escort was charged with possession of PCP and resisting arrest, and the charges were only dismissed pursuant to an agreement between Escort and the District Attorney's office. Escort had to take and pass six drug screens and stay clean, or the criminal charges would have proceeded forward.

In *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364 (1994), the Supreme Court held that, in order to recover damages for an allegedly unconstitutional conviction or imprisonment, or for

4

other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus. Under the *Heck* doctrine, there can be no viable claim for damages where charges are dismissed pursuant to pretrial programs such as pretrial diversion agreements, accelerated rehabilitation disposition programs, deferred adjudication orders, and pretrial intervention programs, wherein charges are dismissed only after the criminal defendant successfully completes a probationary period. See *Bates v. McKenna,* 2012 WL 3309381, at *3-4, (W.D. La. Aug. 13, 2012). In *Taylor v. Gregg,* 36 F.3d 453 (5th Cir. 1994), the Fifth Circuit reasoned "that entering a pre-trial diversion agreement does not terminate the criminal action in favor of the criminal defendant." *Id*. at 456. The court held that "by entering these agreements, criminal defendants are effectively foregoing their potential [civil] suit[s] in exchange for conditional dismissal of their criminal charges." *Id*. The Fifth Circuit has also noted that "proceedings are terminated in favor of the accused only when their final disposition indicates that the accused is not guilty." *Evans v. Ball*, 168 F.3d 856, 859 (5th Cir. 1999).

While Escort admitted in his deposition that he had a bottle of PCP in his possession at the time of his arrest, and that the dismissal of the case against him was prefaced on proof of six "clean" drug screens, he argues that the *Heck* doctrine is inapplicable. He maintains that nothing in his file sets forth the reasoning of the Assistant District Attorney ("ADA") at the time the agreement was made, there was no formal program, there was no defined probationary period, and he was not monitored by the Office of Probation and Parole or the Office of the District Attorney. He argues further that he did not have to admit guilt or waive defenses. Further, he

5

argues there is nothing in the record to establish whether or not the dismissal of the case was based on the unworthiness of the prosecution versus his own admitted actions.

After a review of the relevant case law, the Court agrees with Defendants that Escort's excessive force claim is barred by the *Heck* doctrine. By his own admissions during his sworn deposition, Escort willingly participated in the program offered by ADA White and his probation officer in order to "get clean" and to have the instant charges against him dropped. He understood, too, that if he failed any one of the six drug screens ordered, the charges that were levied against him stemming from the arrest at issue would proceed forward. Therefore, there can be no viable claim for excessive force, under the *Heck* doctrine.

### b. Qualified Immunity

Defendants further contend that, even if Escort's excessive force claim was not precluded by the *Heck* doctrine, Officer Miles is entitled to qualified immunity.

Escort alleges that after he told Officer Miles he did not have his driver's license, Officer Miles asked him to step out of his car, and that Officer Miles became aggressive when there was some confusion as to where Escort should be standing. It was at this point that Escort claims that he panicked and ran from Office Miles. However, after a few steps (7-8), Escort terminated the flight, recognizing the flight would only tend to make matters worse. As soon as Escort stopped, Officer Miles proceeded to forcibly slam him to the ground, even though Escort maintains that he was not combative. Escort admits that when Officer Miles "tackled" him, he "was doing what he had to do, as a cop, to stop me" [Doc. No. 24-4, p. 57], but believes he should not have been taken down after he stopped. While Officer Miles was on Escort's back he allegedly forcibly "yanked" and "twisted" Escort's arm while attempting to handcuff Escort, causing a fracture of the right elbow.

Escort states that he advised Officer Miles, immediately after he was cuffed, that his arm was broken. Escort further states that Officer Miles expressed to him that he should not have run, establishing in the mind of Escort that the excessive force was in retaliation for his limited flight.

Escort asserts that Officer Miles threatened him not to tell anyone that his arm was hurt, or else Officer Miles would tow his car and tell his probation officer. Officer Miles further stated he did not want to spend time in the hospital caring for Escort's medical condition. At intake Escort claims he initially refused to answer questions related to the medical problems, but when it became obvious that he was in substantial pain, he was provided medical assistance during booking. An X-ray was taken, but Escort was advised the X-ray did not show any fracture. After being released, Escort went to Lafayette General Medical Center emergency room, where he was diagnosed with a nondisplaced fracture of the radial head (right above the elbow).

Defendants, on the other hand, paint a somewhat different picture. Officer Miles states that he stopped Escort because he saw Escort make an illegal U-turn. When Escort first exited his vehicle, Officer Miles noticed that he was stumbling and did not look normal, and Officer Miles noted a strong odor emitting from Escort's person—a chemical smell, similar to the odor he has smelled in past instances when a person has ingested PCP. During questioning, Escort at first indicated that he had a driver's license and proof of insurance. Officer Miles allowed Escort to go back to his vehicle to obtain these items, but when Escort returned to the front of Officer Miles' unit, Escort admitted that he did not have on his person a valid driver's license nor insurance. At this point, Officer Miles asked Escort (for both his own safety and that of Officer Miles) to put his hands on the hood and to submit to a pat down for weapons. Escort said, "OK,"

and as soon as Officer Miles went to pat him down, Escort made a move for his right pocket. It was at this point that Escort ran. While Escort was running away, Officer Miles saw Escort throw something to the ground. What alarmed Officer Miles the most was the chemical smell typical of PCP, and Escort running and then tossing the Scope bottle, which was later determined to contain PCP. These facts indicated to Officer Miles that Escort was high on some type of drug. Officer Miles grabbed Escort from behind, and they both went to the ground.

While on the ground, Escort was resisting. He would not put his hands behind his back. At this point, a civilian stopped and offered assistance to Officer Miles. Officer Miles was able to stand Escort up and walk him back to the unit.

Although the versions of events relayed by Escort and Officer Miles differ on some matters, the Court views the facts in the light most favorable to Escort. The Court finds further that the differences are not meaningful for the Court's analysis of the motion for summary judgment.

First, Escort claims that he ran only 7 to 8 steps; whereas, Officer Miles claims that Escort ran across the street to the Church's parking lot. This difference of accounts does not create a genuine issue of material fact, since Escort admits that he fled from Officer Miles during the traffic stop.

Second, Escort claims that he had stopped his flight from Officer Miles because he was borrowing his sister's car, and he did not want her car to be towed if he managed to escape. However, Escort admits that as soon as he stopped fleeing, Officer Miles was "already there" and took him down to the ground. Escort admits that Officer Miles' contact with him was immediate and simultaneous with his decision to stop his flight from the officer, and there is no evidence

8

that Officer Miles was aware Escort had already stopped his flight. It is immaterial that Escort had stopped his flight prior to the take down.

Third, Escort claims that when Officer Miles took him down to the ground, a Scope bottle containing PCP "slid" out of his possession. Officer Miles contends that Escort threw the Scope bottle during his flight. However, it is undisputed that Escort had a Scope bottle containing PCP in his possession.

Fourth, Escort characterizes the take down maneuver used by Officer Miles as a "bear-hug." Escort landed on his right side, with his knee hitting the ground first. Escort admits that the tackle was something that Officer Miles had to do, as a cop, to stop him. Regardless whether the tackle and take down was all in one motion, or there was an "extra body slam," Escort does not contend that he was injured in the take down. Instead, Escort claims that his elbow was broken when Officer Miles grabbed his arm from under him, pulled it, and twisted it to put the handcuffs on him.

Having resolved these factual issues, the Court must now analyze Officer Miles' conduct under the doctrine of qualified immunity.

"The doctrine of qualified immunity immunizes government officials acting within their discretionary authority from civil damages if their conduct does not violate clearly established constitutional law of which a reasonable person would have known." *Modica v. Taylor*, 456 F.3d 174, 179 (5th Cir. 2006). Whether an individual is entitled to qualified immunity is determined by following a two-part analysis. First, the court must determine whether the facts, taken in the light most favorable to the party asserting the injury, show that the official violated a "clearly established" constitutional right. *Price v. Roark*, 256 F.3d 354, 369 (5th Cir. 2001). If there is no constitutional violation, the inquiry ends in favor of the official asserting qualified

immunity. *Mace v. City of Palestine*, 333 F.3d 621, 624 (5th Cir. 2003). Second, the court must determine whether the official's conduct was objectively reasonable in light of the clearly established law. *Saucier v. Katz*, 533 U.S. 194, 202 (2001). In other words, courts look to whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Price*, 256 F.3d 15 369. Qualified immunity protects officials who merely make a mistake in judgment and it shields "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 344-45 (1986). When a defendant asserts qualified immunity, the burden is on the plaintiff to produce evidence to pierce that immunity. *Atteberry v. Nocona General Hospital*, 430 F.3d 245, 253 (5th Cir. 2005).

Escort claims violations of the Fourth and Fourteenth Amendments for unreasonable search and seizure by use of excessive force and in failing to provide medical care. Claims of excessive force are analyzed under the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 388 (1989). To succeed on an excessive force claim under 42 U.S.C. § 1983 and overcome qualified immunity, a plaintiff bears the burden of showing "(1) an injury (2) which resulted directly and only from the use of force that was excessive to the need and (3) the excessiveness of which was clearly unreasonable." *Manis v. Lawson*, 585 F.3d 835, 843 (5th Cir. 2009). "In gauging the objective reasonableness of the force used," the court "must balance the amount of force used against the need for the force." *Ikerd v. Blair*, 101 F.3d 430, 434 (5th Cir. 1996). With the understanding that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion," courts should look at the following factors when judging the reasonableness of force: (1) the severity of the crime; (2) whether the suspect poses an immediate threat to the safety of the officers, himself, or others; and (3) whether the suspect is actively resisting arrest or trying to flee from the officers. *Graham,* 490 U.S. at

396. Whether a particular use of force is reasonable "must be judged from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight." *Id*. Courts should also recognize that officers must make split-second decisions in stressful and unpredictable circumstances. *Id*.

Applying the relevant case law to the facts of this case, the Court finds Defendants are entitled to summary judgment on the basis of qualified immunity.

In *Poole v. City of Shreveport*, 691 F.3d 624 (5th Cir. 2012), the Fifth Circuit upheld a district court's determination that two officers accused of using excessive non-lethal force were entitled to summary judgment based on qualified immunity. The officers used force on the plaintiff after he had been pulled over for a traffic violation, he smelled of alcohol, and a verbal dispute between plaintiff and one of the officers escalated. *Id*. at 635. The officers forced the plaintiff against his truck, with one holding his left arm while another tazed him repeatedly. After additional struggle, including a violent takedown and more use of a Taser, the officers were able to get the plaintiff in handcuffs. *Id*. at 625-26. In the course of the struggle, the officers dislocated plaintiff's left elbow, resulting in multiple surgeries and permanent injuries. *Id*. at 626. The plaintiff sued, alleging that the officers had used excessive force.

The Fifth Circuit upheld the district court's grant of summary judgment. In particular, the court held that the officers' use of force was objectively reasonable because: (1) the plaintiff actively resisted arrest by ignoring verbal commands; (2) the officers tailored their use of force to the plaintiffs increasing resistance, escalating from verbal commands, to physical force, to the repeated use of a Taser; (3) the officer quickly applied his Taser, demonstrating an effort to minimize injury; and (4) after gaining control of plaintiff, the officers recognized the injury and immediately called for medical assistance. *Id*. at 629. In reaching its conclusion, the court

emphasized that the plaintiffs refusal to "turn around and be handcuffed, posed an 'immediate threat to the safety of the officers.'" *Id.* (citing *Deville v. Marcentel*, 567 F.3d 156, 167 (5th Cir. 2009)).

In the instant case, Escort smelled of what Officer Miles believed to be PCP, failed to produce a driver's license, and admittedly resisted arrest by ignoring verbal commands and by running. Officer Miles' contact with him was immediate and simultaneous with Escort's alleged decision to stop his flight from the officer. Thus, there could have been no time for Officer Miles to see or perceive that Escort was "surrendering." Even Escort acknowledges that Officer Miles did what he had to do, as a cop, to stop Escort from running. Therefore, Officer Miles is entitled to qualified immunity for his actions up to the point of handcuffing Escort.

With regard to Escort's argument that Officer Miles used excessive force in handcuffing him, the method of the force used by Officer Miles, and that complained of by Escort—pulling and twisting of his right arm to handcuff him—cannot be said, in and of itself, to be that type of force that is typically "unreasonable". Grabbing a suspect's arm or wrist and twisting and pulling to effectuate an arrest does not typically involve a level of force found to be unreasonable.[1] Courts have generally referred to such force as "relatively minimal" and

---

[1] Although the Court views the evidence in the light most favorable to Escort, the Court notes that, apparently a witness assisted in the handcuffing. Defendants attached to their motion for summary judgment a certified copy of the Internal Affairs report, which includes a transcript of the statement made by a witness, Christopher George, wherein George states that he observed "Officer Miles struggling with the uh, with the guy…and the guy was kind of swinging on him and, and, and kinda and was resisting and he ran off… And by that time they had made it into the Church's parking lot ... And I, uh he had him on the ground, and Irvin back was to Officer Miles uh, and he was resisting. You know he didn't want to get on his stomach or nothing and he still was fighting. So I asked Officer Miles if he needed some help. And he told me yea. So I ran over and uh, I put my right knee on his uh lower back and my left hand grabbed his left arm. Irving's left arm, uh so he could stop resisting and fighting Officer Miles, and as I did that he stopped … I pulled um Irving's left arm behind his back so Officer Miles can put the cuffs on him. And after that um he put the cuffs on him and he just sat him up and told him don't run and that was basically it … And he went, and he went uh, find the bottle of uh, he had. I forgot what that is. Something it's called uh formaldehyde, you know, it on the street it's called Wet … I could smell it on him, uh Irving and I was like man like you don't realize this is killing people you know…". [Doc. No. 24-6, p. 67-68]

"minor". *Donovan v. Phillips*, 685 Fed. Appx. 611, 612-13 (9th Cir. 2017) (officer's use of "control hold" when plaintiff exited car by "gripp[ing] her wrist, and pull[ing] her arm downward, causing Donovan to roll onto the ground" was "relatively minimal" force); *James v. Oakland Police Dep't.* 2016 WL 3230704, at *7 (N.D. Cal. 2016)("to take the struggling James to the ground and hold him while handcuffing him, and holding him on the ground until the ambulance arrived, were minor uses of force, most certainly not out of line with the resistance he offered"); see also *Zivojinovich v. Barner*, 525 F.3d 1059, 1072 (11th Cir. 2008) ("pull[ing] [plaintiff's] arm up at an uncomfortable angle while escorting him out" and "using an uncomfortable hold to escort an uncooperative and potentially belligerent suspect is not unreasonable"); *Schultz v. Hall,* 365 F.Supp.2d 1218 (N.D. Fla. 2005) (summary judgment granted to defendant police officers finding that the force used to arrest the plaintiff was not excessive, despite the fact that the arrest was for a non-violent traffic offense, the arrestee did not pose an immediate danger to the officers or other persons, when the officer used ordinarily accepted handcuffing technique).

Here, Escort admits that his right arm was under the weight of his body. He admits that Officer Miles conducted a takedown maneuver immediately after he stopped fleeing. When attempting to handcuff a suspect whose arm is under his body, some degree of pulling will be necessary to gain control of the person's arm to complete handcuffing. Officer Miles did not strike Escort. He did not use any type of arm bar technique. He simply pulled Escort's arm from under his body and turned his arm to handcuff him. *See and compare Wordley v. San Miguel*,

---

George also stated that he did not see Officer Miles pick up Escort and slam him to the ground, he did not hear Escort at any time complain of any injuries, and Escort did not complain that his arm was broken. *Id.* at p. 69. George concluded, "Yea um I would say uh Officer Miles did an outstanding job because I feel. I mean. If I would intervene, it probably would have went worser than what it was cause he was resisting so much you know." *Id.*

13

915 F.Supp.2d 1312 (S.D. Fla. 2013) (A reasonable officer would not have known that twisting plaintiff's hand while handcuffing him, which resulted in broken finger, amounted to excessive force); *Sanchez v. Obando-Echeverry*, 716 F.Supp.2d 1195 (S.D. Fla. 2010) (finding that police officer was entitled to qualified immunity after the officer grabbed the plaintiff by the wrist, pulled his arm up by the wrist, threw the plaintiff on the ground, and continued pulling on the plaintiff's arm while handcuffing him, which resulted in the plaintiff suffering a torn labrum in his shoulder); *Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir. 2002) (no excessive force found when officer grabbed plaintiff's arm, twisted it around plaintiff's back, jerking it up high to the shoulder and then handcuffed plaintiff as plaintiff fell to his knees screaming that officer was hurting him. The handcuffing technique used by the officer was a relatively common and ordinarily accepted non-excessive way to detain an arrestee).

Accordingly, under these facts, Officer Miles is also entitled to qualified immunity with regard to his handcuffing of Escort.

### 3. Plaintiff's Failure to Provide Medical Care Claim

Escort also asserts a claim for failure to provide medical care. "The Due Process Clause … require[s] the responsible government or governmental agency to provide medical care to persons … who have been injured while being apprehended by the police." *City of Revere v. Mass. Gen. Hosp.,* 463 U.S. 239, 244 (1983). "[T]he plaintiff must show that an officer acted with subjective knowledge of a substantial risk of serious medical harm, followed by a response of deliberate indifference." *Hill v. Carroll County,* 587 F.3d 230, 238 (5th Cir. 2009). Deliberate indifference is "an extremely high standard to meet." *United States v. Gonzales,* 436 F.3d 560, 574-75 (5th Cir. 2006). A plaintiff "must show that the officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct

that would clearly evince a wanton disregard of any serious medical needs.'" *Domino v. Texas Department of Criminal Justice,* 239 F.3d 752, 756 (5th Cir. 2001).

Although Escort claims that Officer Miles threatened him not to tell about his injury, Escort himself admits that within 3 minutes of speaking with the booking officer at the jail, he was taken in for medical assistance. *See Brister v. Robinson,* Docket No. 2018 WL 473263, at *2 (W.D. La. Jan. 17, 2018) (Brister's claims do not meet this standard, as he has admitted that the doctor at CPCF examined him. Accordingly, he has not shown that the prison officials' actions resulted in his medical needs going unmet.) Thus, even if Officer Miles made such a threat, Escort was not denied medical care. Therefore, Escort's failure to provide medical care claim fails, and Defendants are entitled to summary judgment on this claim.

### 4. Plaintiff's 14th Amendment Claims

Escort next claims that his 14th Amendment rights were violated because Officer Miles was aggravated at having to pursue Escort, and was punishing him for the inconvenience.

In the context of the 14th Amendment, the substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense. *County of Sacramento v. Lewis,* 523 U.S. 833 (1998). Only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation. *Id*.

Escort has not provided any evidence which tends to prove that Officer Miles intentionally meant to harm him. Nor has Escort provided sufficient proof to show that Officer Miles' actions were "inspired by malice rather than merely careless or unwise excess of zeal." *Accord Smith v. Lexington Fayette Urban County Government,* 884 F.Supp. 1086 (E.D. Ky.

1995) (Police officers' conduct did not violate plaintiff's due process rights under the 14th Amendment because their conduct was not arbitrary, in the constitutional sense, and was not intentionally designed to punish plaintiff).

Escort claims that Officer Miles was "aggravated" at having to pursue him, and suggests that Officer Miles "punished" him for the inconvenience by intentionally "slamming and breaking" his arm. However, Escort provides no evidence to substantiate this accusation. The sworn deposition testimony shows Escort's injury occurred as a result of Officer Miles's one brief motion of pulling his right arm behind his back from under the weight of his body. An attempt to handcuff a suspect with one motion to pull the suspect's arms behind his back does not rise to the level of conduct "intentionally designed to punish the plaintiff," especially where there was probable cause to effectuate an arrest, and no other force was used once Escort was handcuffed.

Therefore, Escort's 14th Amendment claim fails, and Defendants are also entitled to summary judgment on this claim.

### 5. Plaintiff's *Monell* claim

Having found that Officer Miles' conduct did not cause Escort to suffer a constitutional deprivation, the Court need not inquire into the City's policy and custom regarding training or use of force. *Rooney v. Watson,* 101 F.3d 1378, 1381 (11th Cir. 1996); *see also*, *City of Los Angeles, v. Heller,* 475 U.S. 796, 799 (1986) (finding that a departmental policy or regulation authorizing the use of constitutionally excessive force is not relevant when a person has not been deprived of a constitutional right as a result of actions taken by an individual police officer).

Even if the Court found a constitutional right was violated, Escort still must come forth with sufficient proof under *Monell v. Department of Social Services of City of New York,* 98

S.Ct. 2018, 436 U.S. 658 (1978), to recover against the municipal defendants. In *Monell,* the United States Supreme Court held that a public entity can only be liable under 42 U.S.C. § 1983 if the entity's official or unofficial policy or custom causes a deprivation of constitutional rights. Furthermore, liability can only be predicated on policy established by an official whose acts or edicts may fairly be said to represent official policy. *Bennett v. City of Slidell,* 728 F.2d 762 (5th Cir. 1984), *cert. denied,* 472 U.S. 1016 (1985). Escort must prove that Chief Thomas or LCPCG caused his alleged injuries by way of an officially sanctioned custom, policy, or practice. Moreover, to succeed, Escort must prove that the policy, custom, or practice is in fact widespread, that the custom's continued existence is traceable to policy makers, and that there is a causal connection between the custom and the challenged act. *Id.* In general, proof of a single incident of unconstitutional activity will not suffice. *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823-24 (1985); *Fraire v. City of Arlington,* 957 F.2d 1268, 1278 (5th Cir. 1992).

Escort has presented no evidence of any policy or custom or lack of training, and no evidence to prove that some sort of specialized training would have somehow prevented this incident. Additionally, Section 1983 offers no *respondeat superior* liability. Municipalities are not liable for the constitutional torts of their employees unless those employees act pursuant to official approval. *Monell,* 436 U.S. at 691.

Therefore, Escort's *Monell* claims fail, and Defendants are entitled to summary judgment on this claim as well.

### 6. Plaintiff's State Law Tort Claims

Escort asserts that his state law tort claims are equally valid and that summary judgment should be denied for the reasons he argued above. Escort states that Officer Miles owed a duty to detain and handcuff him in a reasonable manner, and that it is not reasonable to believe that

Officer Miles needed to break his arm to effectuate the arrest. Escort argues in his opposition to the motion for summary judgment that, "In light of Escort's willingness to consent to the detention evidenced by him stopping and raising his arms in surrender, Officer Mile's decision to body slam him to the concrete and further handcuffing him with such force as to break his arm is not a reasonable use of force under the circumstances". [Doc. No. 26, p. 18-19]. He concludes that Officer Miles is not entitled to qualified immunity under state law.

Defendants respond that Escort avers, for the first time, in his affidavit in support of his opposition, that when he stopped running, he held his arms up "to show that I was consenting to speaking with Officer Miles". Nowhere in his deposition, nor in his statement to Internal Affairs, did Escort ever state that he put his hands up prior to Officer Miles' first contact with him. Defendants argue that a party may not create a material issue of fact to defeat summary judgment under Rule 56 by filing an affidavit disputing his own sworn testimony without demonstrating a plausible explanation for the conflict. In his deposition, Escort admitted that Officer Miles' contact with him was immediate and simultaneous with his decision to stop his flight from the officer.

The Court agrees with Defendants. In situations where the non-movant in a motion for summary judgment submits an affidavit which directly contradicts an earlier deposition, and the movant has relied upon and based its motion on the prior deposition, courts may disregard the later affidavit. *S.W.S. Erectors, Inc., v. Infax, Inc.,* 72 F.3d 489, 495 (5th Cir. 1996); *Hyde v. Stanley Tools,* F. Supp. 2d 992, 993 (E.D. La. 2000), *aff'd* 31 Fed. App'x 151 (5th Cir. 2001).

When all of the federal claims in a lawsuit are dismissed, "the district court enjoys wide discretion in determining whether to retain jurisdiction over the remaining state law claims."

*Welch v. Thompson,* 20 F.3d 636, 644 (5th Cir. 1994). Under Louisiana, law, the same standard is used in analyzing a state law claim of excessive force as a federal constitutional claim—reasonableness under the circumstances. *Reneau v. City of New Orleans,* 2004 WL 1497711 (E.D. La. 2004), (citing *Kyle v. City of New Orleans,* 353 So.2d 969 (La. 1977) and *Mathieu v. Imperial Toy Corporation,* 646 So.2d 318, 323 (La. 1994)).

Escort has not shown that Defendants breached a duty of care under state law. In *Mathieu,* the court stated that the scope of an officer's duty is to choose a course of action which is reasonable under the circumstances. *Mathieu,* 646 So. 2d at 322. Use of force by police officers, when making an arrest, is a legitimate police function. *Kyle,* 353 So. 2d at 972*; Lewis v. Kahn,* 95-01203 (La. App. 3 Cir. 3/6/96), 670 So.2d 777, *writ denied,* 96-0818 (La. 5/10/96), 672 So.2d 927. The reasonableness of an officer's conduct is not measured form the view point of the victim but from that of a reasonable man in the officer's position. *Picou v. Terrebonne Parish Sheriff's Office,* 343 So.2d 306 (La. App. 1 Cir. 1977). Even viewed in the light most favorable to him, Escort's actions and flight provoked the use of force in this matter.

Furthermore, Officer Miles is entitled to qualified immunity under state law. "The qualified immunity test covers all state and local government officers at all levels of responsibility." *Moresi v. State Through Dept. of Wildlife and Fisheries,* 567 So.2d 1081 (La. 1990). Identical to the federal standard, the *Moresi* court stated that the qualified immunity test is whether the conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known. *Id.* The court went on to explicitly recognize that the qualified immunity is available to state actors under any action arising from the state constitution. *Id.* at 1093. Inasmuch as the Louisiana state law standard is identical to that of the federal standard, Officer Miles is entitled to qualified immunity as to the state law claims as well.

In addition, the *Heck* doctrine has been found to apply with equal force and vigor under state law. *Williams v. Harding,* 2012-1595 (La. App. 1 Cir. 4/26/13), 117 So. 3d 187.

Finally, with regard to the remaining state law claims against Chief Thomas and LCPCG, which are based on vicarious liability, Escort has failed to establish that Officer Miles committed any breach of duty. Officer Miles used only the force necessary to try to stop a fleeing suspect with illegal drugs. Consequently, no negligence can be found on the part of Chief Thomas and LCPCG, and Defendants are entitled to summary judgment on Escort's state law claims as well.

## III. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment [Doc. No. 24] is **GRANTED,** and Escort's claims against all Defendants are **DISMISSED WITH PREJUDICE.**

MONROE, LOUISIANA, this 25th day of July, 2018.

_____
**TERRY A. DOUGHTY
UNITED STATES DISTRICT JUDGE**